IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 02: 05cr0235 |
| | ) | |
| RAYMOND M. WALKER | ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

May 11, 2006

  Defendant, Raymond M. Walker ("Walker"), was indicted by a Grand Jury on August 4, 2005, and charged with one count of Possession of a Firearm By A Convicted Felon, in violation of Title 18, United States Code, section 922(g)(1). Currently before the Court is Walker's pretrial motion to suppress. On January 13, 2006, the Court conducted an evidentiary hearing on the Motion to Suppress at which all parties were represented by counsel who presented and argued the issues skillfully and effectively. Brenda Davis, a retired PNC bank manager, and various members of the City of Pittsburgh Police Department, *to wit*, Sergeant Christopher Micknowski, Sergeant Aaron Beatty, and Detective Matthew Lebedda, testified on behalf of the government. Defendant, Raymond M. Walker, testified on his own behalf.

  The central issue to be determined is whether Walker was subjected to a "mere consensual encounter" as the Government contends or to a "seizure" within the meaning of the Fourth Amendment jurisprudence under *Terry v. Ohio,* 392 U.S. 1 (1968), as argued by the defense.

  At the conclusion of the suppression hearing, the record was left open at the request of the Government to potentially present additional witnesses. No additional witnesses were

presented.  On February 7, 2006, counsel returned to Court and presented oral arguments in support of their respective positions.  The Court took the matter under advisement.

A transcript of the testimony adduced at the suppression hearing has not been transcribed to date; however, the Court is prepared to issue its Findings of Fact and Conclusions of Law based upon its notes, recollection, and hearing exhibits.

The Court will discuss primarily those basic facts which are relevant to the motion and except as otherwise indicated the following facts are basically unrebutted.   Based on the testimony and evidence presented at the suppression hearing and the applicable law, the Court enters the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Criminal Procedure 12(d):

**FINDINGS OF FACT**

A.      Testimony of Brenda Davis, PNC Bank Branch Manager

Shortly before 1:00 P.M., on the afternoon of February 3, 2005,  Marshall Pollard, a security officer at PNC Bank, Homewood branch, informed Brenda Davis,[1] the PNC bank manager, that a woman[2] sitting in the waiting area of the bank lobby had told him that a black male was sitting in a brown/tan station wagon outside the bank and was going to rob it.[3]  Ms.

---

[1]   Brenda Davis testified that she was the Branch Manager at the PNC Bank, Homewood Branch, from 1998 until she retired on September 14, 2005.  The bank is located at 618 Homewood Avenue, Pittsburgh, PA.

[2]   The woman was later identified as Pearl L. Harris a/k/a Pearl Jackson.

[3]   The black male sitting in the brown/tan station wagon was later identified as the Defendant, Raymond M. Walker.

Davis looked outside, observed a black male sitting in an older station wagon which was parked directly in front of the bank on the opposite side of the street, took down the license plate number of the car, and then called 911.

Ms. Davis testified that she told the 911 dispatcher what the security officer had told her and she gave a description of the car parked outside the bank. Ms. Davis then told the bank tellers that she had called 911.

B.      Testimony of Sergeant Christopher Micknowski

Sergeant Christopher Micknowski ("Micknowski")[4] testified that on February 3, 2005, he was assigned to uniform patrol, out of Zone 5, East Liberty station. On that day, a few minutes before 1:00 P.M., the police radio dispatch had given out a call that a black male, with a gun, was seated in a brown station wagon outside the PNC Bank, Homewood, and that the individual planned to rob the bank. Micknowski immediately responded to the call. Micknowski drove in his marked vehicle to the bank using a side alley, Formosa Way, and arrived less than a minute after dispatch. Micknowski testified that as he entered Formosa Way, he observed Walker sitting in the driver's seat of a brown station wagon outside the PNC Bank, but he did not think that Walker saw him approach as Walker appeared to be looking towards the bank.

---

[4]     Sergeant Christopher Micknowski testified that he has been a police officer with the City of Pittsburgh Police Department for over seventeen (17) years. He has been a Sergeant for eleven (11) years.

3

Micknowski approached the passenger side of the vehicle on foot and noticed that the passenger window was opened slightly, there did not appear to be anyone else in the vehicle, and he could see that Walker had nothing in either of his hands. There was no gun in view.

Micknowski introduced himself to Walker, asked if he could talk to him. He told Walker that he was responding to a 911 service call, which had reported that the driver of the vehicle had a gun and was planning to rob the bank. Micknowski asked Walker if he was involved with the planned robbery; Walker responded that he was not. Micknowski then asked Walker to slide across the front seat of his vehicle and exit from the passenger side. Walker complied and once outside the vehicle, Micknowski asked Walker if he could "tap him down." Again, Walker consented and was cooperative.

During this conversation, Walker and Micknowski were facing each other. Once it was agreed that Walker would be patted down, Micknowski asked Walker to put his arms behind his back, with his fingers interlocked, and turn around. Again, Walker complied and Micknowski conducted a pat down of Walker. Micknowski asked Walker if he had anything illegal on him. According to Micknowski, Walker replied hesitantly "no," which raised Micknowski's suspicions.

Micknowski then asked Walker a direct question: "Is the gun in the car?," to which Walker responded "yes." Micknowski inquired "can I get the gun from the car?" Walker told him that the gun was in the trunk alongside of the spare tire. Micknowski testified that once Walker admitted there was a gun, he told Walker that he would handcuff him, both for the

safety of Walker and Micknowski. According to Micknowski, Walker gave his permission for Micknowski to retrieve the gun.

After Walker was handcuffed, he was placed in the custody of Officer James Ganaway, a second officer who had arrived at the scene.[5]  Micknowski retrieved the gun, which he found in the location where Walker said it was going to be.

Once the firearm was retrieved, Micknowski asked Walker several other questions, including whether Walker had a license to carry a firearm (which he did not) and his name and address. Walker volunteered that he was on parole for bank robbery. Walker was then placed in a police car and Micknowski and Officer Hubbard went into the bank to interview the bank manager.

Prior to entering the bank, Micknowski thought the information relayed to the 911 dispatcher came directly from the bank manager. Once inside, he learned that Pearl Harris had supplied the information to a security guard, who in turn conveyed the information to the bank manager.

After interviewing both Ms. Davis, the bank manager, and Ms. Harris, Micknowski decided that Walker should be interviewed by the City of Pittsburgh robbery detectives. Arrangements were then made for Officer Ganaway to transport Walker to the East Liberty station.

---

[5]  On cross examination, Micknowski testified that within fifteen (15) minutes of the dispatch call, police in four to five marked cars arrived at the scene. However, at the time that Walker was placed in handcuffs, Micknowski testified that he was the only police officer present at the scene.

C.        Testimony of Sergeant Aaron Beatty

Sergeant Aaron Beatty ("Beatty"),[6] of the City of Pittsburgh Police Department, robbery division, testified that he interviewed Walker at the police station. Walker's feet were shackled to the floor, and he was very cooperative and his "demure was laid back." Beatty testified that the information he received from his fellow officers was that Walker was outside of a bank which he planned to rob. It was Beatty's understanding that Walker was already under arrest for a firearm violation.

Beatty testified that a written Miranda Waiver Form was signed by Walker, but the signed form is missing from the police files.[7] Walker also prepared and signed a handwritten statement which reflects that he found the gun which was located in his vehicle in an alley. Beatty asked Walker if he had any other guns, and Walker told him that he had another gun at his apartment.

After Walker signed the Waiver, he gave no information about his involvement in other robberies. Accordingly, Beatty notified the officers from Zone 5 that they could take over because Walker had no information which pertained to other bank robberies.

---

[6]     Sergeant Beatty testified that he has been a City of Pittsburgh police officer for eleven (11) years, and since 2002 and has been a Sergeant in the robbery division.

[7]     On cross examination, Beatty testified that he would have been the officer to give Walker his Miranda warnings, but he does not recall filling out the required paperwork. It is undisputed that the Miranda warnings paperwork should have been attached to Walker's handwrittten statement.

D.	Detective Matthew Lebedda

Detective Matthew Lebedda[8] ("Lebedda") testified that Sergeant Micknowski instructed him to go to Police Headquarters and retrieve a signed Consent to Search form which Walker had signed. When Lebedda arrived at Police Headquarters he was informed that Walker had <u>not</u> signed the Consent to Search form, so he proceeded to the interrogation room to find Walker and have him sign the form.[9] Lebedda told Walker that he was going to "Mirandize" him, but Walker said that was not necessary as he had already been Mirandized. Lebedda told Walker that it would be necessary for Lebedda to repeat the Miranda warning process since he was not present at the earlier reading of his rights.

Lebedda testified that he proceeded to read Walker his Miranda rights directly off a card. Walker then waived his rights and agreed to speak with police. Walker told Lebedda that there was a firearm in his bedroom closet, but that the firearm did not work. At approximately 2:45 PM, Walker verbally agreed to allow the police to search his home and signed and dated the Consent to Search form. Lebedda testified that Walker was very cordial and friendly and seemed more than willing to cooperate.

---

[8]	Detective Matthew Lebedda testified that he has been an officer with the City of Pittsburgh Police Department for thirteen (13) years. For the last three (3) years, he has been assigned to general investigation out of Zone 5 (which covers Homewood and East Liberty).

[9]	On cross examination, Lebedda admitted that the Supplemental Report he prepared is not accurate because it indicates that he was given a signed Consent Form at the time he arrived at police headquarters. Further, the Supplemental Report does not indicate that Walker was Mirandized again.

At approximately 4:00 PM, the police searched Walker's apartment where they found a .25 caliber handgun, with live bullets, in the bedroom closet. The gun was not operable, as Walker had told them it would be.

E.     Raymond Walker

Walker testified that he has known Pearl Harris a/k/a Pearl Jackson ("Harris") approximately forty (40) years. Harris is a crack-cocaine addict, with mental instabilities due to her addiction. She also has convictions for bad checks and identity theft.[10] At the time of his arrest, Walker was working full time (40 - 50 hours a week) at Clean Care on the North Side of Pittsburgh, earning $7.25 an hour.

On February 3, 2005, Walker had taken Harris to the PNC Bank so that she could retrieve money she owed him. He had been waiting for Harris in his car almost fifteen (15) minutes when he first saw Micknowski approach him. Micknowski walked up to his vehicle and asked Walker if he would get out of the car so that Micknowski could talk with him. Walker asked Micknowski several times, "what's going on" and Micknowski told him that he was responding to a "service call" and again asked him to get out of the car. Walker testified that he felt like he had to comply, so at Micknowski's express direction, he slid across the front seat of his car and exited through the passenger's door. Walker also testified that at first Micknowski was using a friendly voice, but by the time Walker was out of the car, Micknowski was agitated.

---

[10]     Walker himself has four prior convictions, each for bank robbery. Walker testified that none of these convictions involved a firearm, but rather all were "note jobs."

Micknowski proceeded to pat down Walker and during the pat down he told Walker that he was responding to a 911 dispatch call which reported that "You were outside the bank and were going to rob it."[11]  By this time, Walker testified that he was beginning to think that Harris had turned him in because she did not want to pay him back.  Walker testified that he then replied, "I know that bitch didn't tell you I was gonna rob the bank."  After the pat down, Walker was handcuffed by Micknowski.

Walker testified that he told Micknowski that a gun was in his trunk, wrapped in a towel.  Additionally, Walker testified that Micknowski asked him three times where the gun was, but he never asked if he could retrieve it from the car.

Walker was then placed in Detective Ganaway's vehicle, who took him to the North Side station for interrogation.  Walker testified that he was surrounded by a lot of activity at the police station, and that he saw seven (7) to eight (8) different police officers.  However, Walker testified that none of the officers read him his Miranda rights, including Detectives Beatty and Lebedda. Walker told the officers that he had a gun in his apartment but that it didn't work as it was an antique.

Walker testified that when he saw Detective Lebedda "things were very confusing." Walker was looking at photographs with one officer and, at the same time, Lebedda was handing him the Consent to Search form.  Lebedda told him that Walker's parole officer was going to meet Lebedda at Walker's apartment and it was Walker's belief that because he was on

---

[11]  Walker testified that Micknowski definitely did not say that it was reported that a black male was sitting in a wagon and was going to rob the bank.  Rather, he specifically recalls that Micknowski said that he (Walker) was sitting in a car ready to rob the bank.

parole, the parole officer could get into his apartment with or without the signed Consent to Search form. Therefore, Walker believed that it did not matter whether he signed the form or not. Walker testified that at the time he signed the Consent to Search form, he did not think he had the option to refuse. Further, Walker testified that he did not read the Consent to Search form prior to signing it. Walker also testified that he never signed a Waiver of Miranda Rights form, but he acknowledged that he did sign a written statement which indicates that he had found the gun in an alley.

On cross examination, Walker testified that on February 2, 2005, he found a .32 caliber blue steel revolver, with loose bullets, in a white plastic bag laying on the ground on Formosa Way. He noticed that the hammer of the gun was sticking out of the bag. The gun was not loaded, but later that night, he loaded the gun with five (5) rounds, and put the remaining bullets in his closet. He then put the gun in the trunk of his car. Walker testified that he told Harris about finding the gun.

## CONCLUSIONS OF LAW

Walker contends that he was seized in violation of the Fourth Amendment to the United States Constitution. Walker argues that the circumstances of his encounter with Micknowski constituted an unlawful seizure because Micknowski had no reasonable basis for believing that "criminal activity was underfoot." Therefore, Walker argues that the physical evidence retrieved by the police officers during the search of his car and apartment, as well as any statements he made to police officers, must all be suppressed as they are tainted by an illegal search.

*The Fourth Amendment*

The Fourth Amendment of the United States Constitution protects individuals from "unreasonable searches and seizures." *U.S. Const. amend. IV.* On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable. *United States v. Ritter,* 416 F.3d 256, 261 (3d Cir. 2005).

A "seizure" does not occur simply because an officer approaches an individual and asks a few questions. *See Florida v. Bostick,* 501 U.S. 429, 434 (1991). Rather, "a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall,* 446 U.S. 544, 551 (1980).

If an investigative stop rises to the level of a "seizure" it will pass constitutional scrutiny only where police have a reasonable suspicion, based upon specific and articulable facts, "that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1 (1968); *see also Illinois v. Wardlow,* 528 U.S. 119, 123 (2000). Although reasonable suspicion is less demanding than probable cause, the Fourth Amendment requires that an officer making a stop have some level of objective justification for that stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). The police "officer must demonstrate that the stop was based on something more than an 'inchoate and unparticularized suspicion or hunch." *United States v. Ramos*, slip opinion, -- F.3d ---, 2006 WL 861179 at *3 (3d Cir. April 5, 2006) (quoting *Sokolow,* 490 U.S. at 7).

Consensual encounters, in contrast, occur where a reasonable person would feel free to disregard the police and go about his business or to "decline the officer's requests or

otherwise terminate the encounter." *Bostik*, 501 U.S. at 439.   "It is well established that police officers who lack reasonable suspicion may approach and question people seated in vehicles in public places," because "merely approaching an individual, whether standing or in an automobile, does not constitute a seizure under the Fourth Amendment," provided that the individual would feel free to decline the officer's request. *United States v. Williams*, 413 F.3d 347, 353-54 (3d Cir. 2005) (citing 4 Wayne R. LaFave, Search and Seizure, § 9.3(a), at 96-97 (3d ed. 1996)).

In the matter *sub judice,* the Court must initially determine whether the encounter between Walker and Micknowski constituted a "seizure."  If  it was a "seizure" then the next question the Court must determine is whether Micknowski acted upon an articulable, reasonable suspicion of criminal wrongdoing in effectuating that seizure.

*i.  Was Walker Subjected to a "Seizure"?*

The key characteristic of a seizure is that a reasonable person would not feel free to "disregard the police and go about his business." *Bostick,* 501 U.S. 434.  "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search and seizure itself." *United States v. Montoya de Hernandez,* 473 U.S. 531, 537 (1985). In *Terry,* the United States Supreme Court explained that, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry,* 392 U.S. at 19 n. 16.  More recently, the Supreme Court has held that, for there to be a seizure, the police must apply some physical force to the person being seized or the person must submit to an assertion of police authority. *California v. Hodari D.,* 499 U.S. 621, 626-28 (1991).  Our appellate court has explained that

"a seizure occurs whenever an officer restrains the freedom of a person to walk away." *Curley v. Klem,* 298 F.3d 271, 279 (3d Cir. 2002) (*citing Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).

The record evidence demonstrates that Micknowski was in full uniform and driving a marked vehicle when he initially approached Walker. Both Micknowski and Walker testified that Micknowski told Walker that he was responding to a 911 service call which had reported that "a black male" who was sitting in a car outside the bank was going to rob it. Further, Walker testified that although initially Micknowski used a friendly voice, by the time Walker exited the car, Micknowski was agitated. Walker also testified that he felt like he had to comply with Micknowski's direction to exit his vehicle through the passenger door.

Based on the totality of the circumstances, the Court finds and rules that a reasonable person in Walker's shoes would not have felt free to "disregard the police and go about his business." Thus, the Court finds and rules that Micknowski effectuated a Fourth Amendment seizure. Consequently, the Court must next determine whether Micknowski had reasonable suspicion to seize Walker.

### ii. Was the Seizure Based Upon Reasonable Suspicion?

As discussed *supra,* a warrantless seizure does not violate the Constitution when the stop is based upon a reasonable suspicion that "criminal activity may be afoot." *Terry*, 392 U.S. at 30. Reasonable suspicion must be more than an "inchoate and unparticularized suspicion or hunch of criminal activity," rather it must be based upon specific and particular facts. *Illinois v. Wardlow,* 528 U.S. 119, 123-24 (2000) (*quoting* Terry, 392 U.S. at 27). The government contends that Micknowski had reasonable suspicion to seize Walker based on the

information he received from the 911 dispatch. Walker, not surprisingly, contends that Micknowski found nothing to corroborate the report of the planned bank robbery and, thus, Micknowski did not have reasonable suspicion to seize Walker or to conduct a *Terry* frisk.

In evaluating whether a particular stop was justified, courts must look at the totality of the circumstances surrounding the seizure. *Sokolow*, 490 U.S. at 8 (*quoting United States v. Cortez*, 449 U.S. 411, 417 (1981)). The Court of Appeals for the Third Circuit has noted that:

> The Supreme Court has repeatedly recognized that reasonable suspicion may be the result of any combination of several factors: specialized knowledge and investigative inferences (*United States v. Cortez)*, personal observation of suspicious behavior (*Terry v. Ohio*), information from sources that have proven to be reliable, and information from sources that - while unknown to police - prove by the accuracy and intimacy of the information provided to be reliable as to the details contained within that tip (*Alabama v. White*). In *United States v. Cortez* the Court expanded on the standard:
>> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances--the whole picture--must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. 449 U.S. 411, 417-18 (1981).

*United States v. Nelson,* 284 F.3d 472, 478 (3d Cir.), *cert. denied,* 537 U.S. 940 (2002).

The Court finds and rules that the information provided to Micknowski via the radio dispatch call and his subsequent observation of a black male sitting in a vehicle parked across the street from the bank does not satisfy any of the criteria which would justify the seizure of Walker.

First, at the time Micknowski "seized" Walker, the only information he had that "criminal activity was afoot" was a 911 radio dispatch which indicated that a black man was sitting in a brown/tan station wagon parked across the street from the bank, that the man had a gun, and that he planned to rob the bank. Our appellate court has stated that a mere tip that a suspect was going to rob a bank "would fall woefully short of probable case no matter how reliable the informant." *United States v. Stubbs*, 281 F.3d 109, 122 (3d Cir.), *cert. denied*, 535 U.S. 1028 (2002). *See also Florida v. J.L.,* 529 U.S. 266, 272 (2000) (holding that a mere anonymous tip that a described individual was carrying a gun was insufficient to provide reasonable suspicion for a *Terry* stop and frisk).

In *Stubbs,* an informant told FBI agents that a bank was going to be robbed, and specifically identified the defendant as the individual who was going to rob the bank. The tip was corroborated by the surveillance of the defendant. The agents followed the defendant and his companions as they circled blocks, drove around banks without going in, and put on ski masks while parked in the parking lot near one of the banks. At that point, our appellate court found that the agents could fairly conclude that the defendant and his companions "had not gotten lost on the way to a downhill slalom competition. They could reasonably assume that the ski masks were going to be used in a bank robbery, just as the informant had predicted." *Stubbs*, 281 F.3d at 122.

Micknowski's own testimony reflects that no attempt was made to corroborate the basis of Ms. Harris's "knowledge" that Walker was planning to rob the bank. *See Illinois v. Gates*, 462 U.S. 213, 299 (1983) (veracity, credibility, and basis of informant's knowledge remain "highly relevant in determining the value of the informant's report"). Micknowski had

no idea how long Walker had been in the car, how long the car had been parked, or to whom the car even belonged.

Furthermore, Micknowski testified that it was not until he went into the bank after Walker was placed in police custody that he learned that the information provided to the 911 dispatch had not come directly from the bank manager. It was at that time that he learned that Pearl Harris had supplied the information to a security guard, who in turn told Ms. Davis, the bank manager. Prior to Walker being taken into custody there was no attempt by any police officer to corroborate any of the information received from the 911 dispatch.

The Court finds and rules that the failure to corroborate in the instant case distinguishes this case from *Stubbs,* in which there was ample corroboration that the defendants intended to rob a bank.

Next, as Micknowski talked with Walker he did not see any "suspicious behavior." In fact, although he had a clear view of the interior of the vehicle, he saw no weapon, both of Walker's hands were visible at all times, and Walker specifically denied any plan or intention to rob the bank. The record does not reflect that Walker made any abrupt movements or engaged in any suspicious, furtive behavior that would have caused Micknowski to suspect that "criminal activity was afoot." Rather, to the contrary, the record reflects that Walker was cooperative at all times.

In summary, Micknowski had only the following salient information when he seized Walker: (1) the fact that it had been reported that a black man sitting in a parked vehicle across the street from the bank planned to rob it; and (2) the fact that Walker at all times acted politely and complied with all police commands and denied any plan to rob the bank.

Reviewing the "whole picture," the Court finds that the government has not met its burden of proving that Micknowski had a reasonable basis for believing that "criminal activity was underfoot" and, as a result, the seizure and frisk violated the Fourth Amendment. *See Terry*, 392 U.S. at 27.

### iii. The Exclusionary Rule

The exclusionary rule mandates that evidence derived from constitutional violations may not be used at trial if it has been obtained "by exploitation of that illegality." *Wong Sun v. United States*, 371 U.S. 471 (1963). In contrast, evidence is admissible if it was obtained "by means sufficiently distinguishable to be purged of the primary taint." *Id.*

The Court of Appeals for the Third Circuit has interpreted *Wong Sun* to involve two discrete inquiries:

> (1) the proximity of an initial illegal custodial act to the [acquired evidence]; and (2) the intervention of other circumstances subsequent to an illegal arrest which provide a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by, that illegal arrest.

*United States v. Burton*, 288 F.3d 91, 99 (3d Cir. 2002).

Because the gun in Walker's vehicle was discovered almost immediately and without the occurrence of any intervening event, the Court finds and rules that it is derivative of the illegal seizure and will be suppressed as "fruit of the poisonous tree." *Wong Sun,* 371 U.S. at 488.

For the same reasons, the Court finds and rules that Walker's alleged consent to search his apartment was the fruit of the prior Fourth Amendment violations and, therefore, the gun that was found in Walker's apartment must also be suppressed.

## CONCLUSION

For the reasons hereinabove stated, the Motion to Suppress filed by Defendant will be granted. An appropriate Order follows.

McVerry, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 02: 05cr0235 |
| | ) | |
| RAYMOND M. WALKER | ) | |

**ORDER OF COURT**

AND NOW, this 11th day of May, 2006, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that Defendant's Motion to Suppress is **GRANTED.** The evidence obtained from the search of Defendant's vehicle and apartment will be suppressed as fruit of the poisonous tree.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc:     Charles A. Eberle,
        Assistant U.S. Attorney
        Email: charles.eberle@usdoj.gov

        Marketa Sims,
        Assistant Federal Public Defender
        Email: marketa_sims@fd.org